NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMG RESOURCES CORPORATION,<br><br>              Plaintiff,<br><br>v.<br><br>WOOSTER MOTOR WAYS, INC. and WMW LOGISTICS, INC.,<br><br>              Defendants. | Case No. 15-3716 (SDW) (LDW)<br><br>**OPINION**<br><br>January 14, 2019 |

**WIGENTON**, District Judge.

      Before this Court are Plaintiff AMG Resources Corporation's ("Plaintiff") claims against Defendants Wooster Motor Ways, Inc. ("Wooster") and WMW Logistics, Inc. ("WMW") (collectively, "Defendants"). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. Venue is proper under 28 U.S.C. § 1391. Based on the testimony and evidence presented at trial, this Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons stated below, this Court finds that Plaintiff has no cause for action.

**I.    PROCEDURAL HISTORY**[1]

      On May 6, 2015, Plaintiff commenced this action in the Superior Court of New Jersey, Essex County; and on June 2, 2015, WMW removed the suit to the District of New Jersey. (ECF No. 1.) On November 12, 2015, this Court denied Wooster's Motion to Dismiss and permitted

---

[1] This Court assumes the parties' familiarity with the procedural history in this matter and thus will summarize only those facts relevant to this Opinion.

Plaintiff to amend its Complaint. (ECF No. 13.) Plaintiff subsequently filed its First Amended Complaint on December 10, 2015. (ECF No. 14.) On November 8, 2017, this Court denied Defendants' motion for summary judgment and granted Plaintiff's cross motion to amend its pleadings for a second time. (ECF No. 69.) On November 14, 2017, Plaintiff filed a seven-count, Second Amended Complaint asserting claims for breach of contract and/or duties in violation of the Carmack Amendment, 49 U.S.C. § 14706 (Count One), breach of contract (Count Two), conversion (Count Three), breach of the covenant of good faith and fair dealing (Count Four), negligence (Count Five), violations of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 *et seq*. (Count Six), and unjust enrichment (Count Seven). (ECF No. 71.) This Court held a bench trial from September 25, 2018 through September 26, 2018. On October 17, 2018, the parties submitted post-trial briefs with proposed findings of fact and conclusions of law. (ECF Nos. 98-99.)

II.    **FINDINGS OF FACT**

Plaintiff purchases, sells, and processes scrap metal products and operates scrap metal processing facilities, one of which is in Newark, New Jersey (the "Newark facility"). (*See* Trial Tr. 36:10-37:2.) Defendant Wooster is a DOT[2] licensed motor carrier that uses its own tractors and trailers to transport freight. (*Id*. 298:17-20, 314:1-3.) Defendant WMW is a DOT licensed freight broker that does not own any trucks but arranges for transportation. (*Id*. 298:21-22, 314:4-6.) Wooster and WMW are located at the same address and share common, but not identical, ownership. (*Id*. 298:23-25, 299:4-6.)

On numerous occasions, Plaintiff's Vice President of Non-Ferrous Metals, Garey Rittenhouse ("Rittenhouse"), would contact WMW's Account Manager, Michael Moore

---

[2] "DOT" refers to the U.S. Department of Transportation.

2

("Moore"), to arrange for the transport of scrap metal.[3] (*Id*. 35:12-13, 39:1-10; 41:8-12, 227:11-14, 255:18-25.) Plaintiff and Defendants never entered into a "master agreement" that would govern their transactions. (*Id*. 49:3-10.) Rather, Rittenhouse would typically call or e-mail Moore to provide information about a particular load (i.e., the type of material being shipped, its origin, and its destination) and ask for a rate. (*Id*. 47:11-22.) Thereafter, Plaintiff "would provide the purchase order number or delivery number for that load and the appropriate date and scheduled amounts." (*Id*. 48:4-7.) Over the course of their relationship, WMW hauled ninety-two loads for Plaintiff, only one of which was carried by Wooster.[4] (*Id*. 333:15-25, 334:9-16.) Rittenhouse never communicated to Moore that Plaintiff "needed a Wooster . . . truck or that it mattered which truck . . . type it would be." (*Id*. 50:4-9.)

On November 3, 2014, one of Plaintiff's employees e-mailed Rittenhouse, copying Moore at WMW, to secure a truck that would deliver a load of copper (the "Copper Load") from Plaintiff's Newark facility to Reading, Pennsylvania. (Ex. J-2 at AMG-0008.) The next day, Rittenhouse e-mailed Moore with pickup and delivery locations, and a purchase order number. (Ex. J-2 at AMG-0007.) Following an e-mail exchange, Rittenhouse advised that the value of the Copper Load was $76,000.00, to which Moore quoted a rate of "$625.00 All-In[.]" (Ex. J-2 at AMG-0006.)

---

[3] At the time of trial, Rittenhouse was no longer employed by Plaintiff and Moore was no longer employed by WMW. (*Id*. 35:14-15, 226:22-227:3.)

[4] This Court notes that Plaintiff entered seven bills of lading into evidence that reflect "WMW" as the carrier for transactions occurring between October and December of 2014. (Ex. P-1 at D0033, D0036, D0048, D0052, D0055, D0057, D0064.) However, the testimony elicited at trial did not show that Wooster trucks were used to carry freight for Plaintiff on those occasions. Rather, the General Manager of Plaintiff's Newark facility, Thomas Amorosi ("Amorosi"), testified that the handwriting on the bills of lading was not his, he could not recall whether he was present when they were created, and he could not verify whether Wooster or WMW trucks were used simply by looking at the records. (Trial Tr. 161:16-22, 190:14-191:20, 193:9-12.) Rittenhouse also testified that the handwriting on the bills of lading was not his, and he was not physically present for the transactions that took place between the parties. (*Id*. 53:25-54:9, 145:9-16, 147:22-148:7.)

Thereafter, WMW used online boards to find a truck and driver that would move the Copper Load and hired a carrier who identified himself as Ramon Theodore Knight ("Knight").[5] (Trial Tr. 243:10-12, 265:14-266:19; *see also id.* 267:9-11.) WMW verified Knight's license and insurance policy. (Ex. P-4; Trial Tr. 244:1-22.) Knight filled out a Property Broker/Contract Carrier Agreement, Carrier Assessment, and Carrier Profile. (Ex. J-8; *see also* Trial Tr. 270:18-271:20.) WMW and Knight entered into a broker-carrier agreement and Knight agreed to transport the Copper Load for $475.00. (Ex. D-9; Trial Tr. 323:19-24.)

On November 12, 2014, a truck arrived at Plaintiff's Newark facility to pick up the Copper Load. (Ex. J-3 at AMG-0024; Trial Tr. 176:3-11.) Plaintiff prepared a bill of lading, listing the carrier as "MKD" and the cargo weight as 37,860 pounds. (Ex. J-5.) The driver's name on the bill of lading is indiscernible. (*Id.*)

Approximately one week after the Copper Load was picked up, Amorosi called Rittenhouse and Moore to report that the load had never reached its destination. (Trial. Tr. 189:1-20.) Thereafter, Plaintiff sent an invoice for $106,784.09 to WMW's Director of Logistics, Joseph Vasichko ("Vasichko"). (Ex. J-6 at AMG-0002.) This valuation factored in additional pounds of scrap metal that were added to the truck at the time of shipment. (Ex. J-2 at AMG-0005.) Prior to the loss, Defendants were never informed that Plaintiff would be increasing the originally stated value of scrap metal to the shipment. (*Id.*) In a letter dated December 10, 2014, Vasichko rejected Plaintiff's invoice for reimbursement, stating that Defendants "did not . . . agree to purchase or receive" the Copper Load. (Ex. P-3.) On December 15, 2014, Vasichko e-mailed Plaintiff to advise that "it does not appear that [WMW's] carrier made the pickup[.]" (Ex. P-4 at AMG-0016.)

---

[5] Plaintiff surmises that the purchase order number was included in WMW's online postings, but the record does not support such a finding.

4

Neither WMW nor Wooster received the Copper Load or were paid for the transaction. (Trial Tr. 338:22-339:8.)

## III. CONCLUSIONS OF LAW

A. <u>Carmack Amendment</u>

The Carmack Amendment imposes strict liability on motor carriers for goods lost in interstate commerce. *See Sanofi-Aventis U.S., LLC v. Great Am. Lines, Inc.*, 718 F. App'x 110, 112 (3d Cir. 2017) (citing 49 U.S.C. § 14706). A "motor carrier" is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). In contrast, a "broker" is "a person, other than a motor carrier[,] . . . that as a principal or agent sells, offers for sale, negotiates for, or holds itself out . . . as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). Generally, brokers are not liable under the Carmack Amendment. *See Phoenix Assurance Co. v. K-Mart Corp.*, 977 F. Supp. 319, 325 (D.N.J. 1997); *Tryg Ins. v. C.H. Robinson Worldwide, Inc.*, No. 15-5343, 2017 WL 5725057, at *6 n.12 (D.N.J. Nov. 28, 2017) (explaining that liability under the Carmack Amendment does not apply to brokers).

"Whether a company is a broker or a carrier is not determined by what the company labels itself, but by how it represents itself to the world and its relationship to the shipper." *Hartford Fire Ins. Co. v. Dynamic Worldwide Logistics, Inc.*, No. 17-553, 2017 WL 3868702, at *2 n.2 (D.N.J. Sept. 5, 2017) (quoting *Hewlett-Packard v. Bros. Trucking*, 373 F. Supp. 2d 1349, 1352 (S.D. Fl. 2005)); *see also Phoenix Assurance Co.*, 977 F. Supp. at 326 (stating a company's relationships and actions, rather than its registration are dispositive of the company's "true identity"). In determining whether a broker acted as a carrier, courts have considered whether the party "accepted responsibility for ensuring delivery of the goods[.]" *CGU Int'l. Ins., PLC v. Keystone Lines Corp.*, No. 02-3751, 2004 WL 1047982, at *2 (N.D. Cal. May 5, 2004).

This Court finds that neither Wooster nor WMW are liable as carriers under the Carmack Amendment. There is nothing in the record to suggest that either Defendant received or transported the Copper Load. Rather, Plaintiff's bill of lading shows that the freight was picked up by a third party known as "MKD." Additionally, there is no proof that the parties' "course of dealing" gave Plaintiff a basis to believe that Wooster was the carrier in this instance. Rittenhouse knew that WMW regularly assigned jobs to other freight carriers. (*See* Trial Tr. 149:20-150:21.) Furthermore, WMW clearly acted as a broker in this case. It did not make any assurances that the Copper Load would be delivered or indicate that a Wooster truck would make the delivery. *See CGU Int'l. Ins., PLC*, 2004 WL 1047982, at *2 (finding that defendant was a broker because it never assumed responsibility for the shipment, never took physical possession of shipment, and designated itself as a "broker" in its contract with a carrier company). Thus, Plaintiff's claim that Defendants violated the Carmack Amendment (Count One) is not actionable.

B. <u>Breach of Contract</u>

To maintain a claim for breach of contract under New Jersey law, Plaintiff must establish: "(1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013) (citing *Coyle v. Englander's*, 488 A.2d 1083, 1088 (N.J. Super. Ct. App. Div. 1985)); *see also Riachi v. Prometheus Grp.*, No. 17-811, 2017 WL 2438838, at *2 (D.N.J. June 6, 2017).

Here, the terms of Plaintiff and WMW's agreement are contained in the brief e-mail exchange between Rittenhouse and Moore. Based on the trial record, WMW did not guaranty delivery of the Copper Load or promise to be responsible in the event of non-delivery, and the parties did not have a master agreement that addressed such terms. (*See* Ex. J-2.) Thus, Plaintiff

has failed to establish that Defendants breached any obligations under their agreement (Count Two).[6]

C. Preemption under the Interstate Commerce Commission Termination Act (the "ICCTA") and the Federal Aviation Administration Authorization Act ("FAAAA")

Pursuant to the ICCTA, "no State . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to intrastate rates, intrastate routes, or intrastate services of any freight forwarder or broker." 49 U.S.C. § 14501(b)(1). Similarly, the FAAAA provides that:

> a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1). Courts have recognized that the ICCTA and FAAAA preempt state-based, common law tort claims.[7] *See Alpine Fresh, Inc. v. Jala Trucking Corp.*, 181 F. Supp. 3d 250, 257 (D.N.J. 2016) ("State common law qualifies as an 'other provision having the force and effect of law.'"); *see also Marx Cos., LLC v. W. Trans Logistics, Inc.*, No. 14-751, 2015 WL 260914, at *4 (D.N.J. Jan. 20, 2015) (finding that negligence claims relating to the services of a broker were expressly preempted by 49 U.S.C. § 14501, and noting that a claim for breach of the covenant of good faith and fair dealing "would be preempted as being outside the confines of the express contractual agreement between the parties"). As such, this Court finds that the ICCTA and FAAAA preempt Plaintiff's claims of conversion (Count Three), breach of the covenant of

---

[6] While this Court need not address the value of the Copper Load, it is noted that there are discrepancies in the valuations as reflected in Rittenhouse and Moore's e-mail communications, Plaintiff's assessment of what was placed on the truck, and the bill of lading. (*See* Exs. J-1, J-2, J-5.)

[7] The federal statutes' preemptive effects do not apply to routine, breach of contract claims. *See Mrs. Ressler's Food Prods. v. KZY Logistics, LLC*, No. 17-2013, 2017 WL 3868703, at *3 (D.N.J. Sept. 5, 2017) (explaining that a breach of contract claim does not amount to a state's enactment or enforcement of laws); *Hartford Fire Ins. Co.*, 2017 WL 3868702, at *3.

7

good faith and fair dealing (Count Four), negligence (Count Five), violations of the NJCFA[8] (Count Six), and unjust enrichment (Count Seven).

IV. **CONCLUSION**

For the reasons set forth above, Plaintiff has no cause for action and this Court will enter judgment in favor of Defendants. An appropriate Order follows.

s/ *Susan D. Wigenton*_____
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:     Clerk
cc:       Hon. Leda D. Wettre U.S.M.J.
           Parties

---

[8] Because Plaintiff's remaining state-based causes of action are preempted, this Court does not reach a full analysis of those claims on their merits. However, it is noted that Plaintiff has not set forth a *prima facie* case to support its NJCFA claim. Specifically, Plaintiff has not demonstrated that Defendants engaged in "unlawful conduct." *See Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 436 (D.N.J. 2012) (listing the three elements of a plaintiff's NJCFA claim as "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's conduct and the plaintiff's ascertainable loss").